J-A12041-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: A.M.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M.P. | No. 1644 WDA 2016 |

Appeal from the Order of September 30, 2016
In the Court of Common Pleas of Allegheny County
Family Court at No(s): CP-02-DP-687-2016 - FID 02-FN-837-2016

BEFORE: OLSON, SOLANO and RANSOM, JJ.

DISSENTING MEMORANDUM BY OLSON, J.:          **FILED JULY 11, 2017**

I believe that some of the most important cases this Court decides are those involving the welfare of children, *e.g.*, dependency, termination of parental rights, and child custody. This is such a case. After carefully reviewing the record of this very difficult case, I have concluded that the trial court made incorrect legal conclusions and, therefore, I cannot agree with the learned Majority that the trial court's decision was proper. Therefore, I respectfully dissent.

As the learned Majority correctly notes, although this Court must apply a highly deferential standard of review when reviewing the trial court's factual findings, this Court is required to review the trial court's legal conclusions *de novo*. **See Majority Memorandum**, **ante** at 4, *quoting* **In re M.B.**, 101 A.3d 124, 126-127 (Pa. Super. 2014). In this case, I agree that the trial court's factual findings are supported by the record. The trial court's legal conclusions, however, are incorrect. The Allegheny County

Office of Children, Youth and Families ("CYF") proved by clear and convincing evidence that A.M.P. lacks proper parental care necessary for her physical health. Accordingly, CYF's dependency petition should have been granted.

As the learned Majority notes, proper parental care is "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." **Majority Memorandum**, **ante** at 5, *quoting* **In re A.B.**, 63 A.3d 345, 349 (Pa. Super. 2013). I focus on two areas where A.C. ("Mother") and J.P. ("Father") failed to provide proper parental care necessary for A.M.P.'s physical health. First, A.M.P. was not receiving appropriate nutrition. Second, A.M.P. was not immunized.

As the trial court correctly noted in its findings of fact, continued malnutrition could lead to the stunting of A.M.P.'s mental and physical development. The feeding A.M.P. received at Children's Hospital of Pittsburgh ("Children's Hospital") and The Children's Institute was successful in boosting A.M.P.'s nutrition. She gained 55 ounces during the 29 days that she was at Children's Hospital and The Children's Institute. The uncontradicted testimony presented at the dependency hearing was that A.M.P. should be gaining approximately one ounce in weight per day if Mother and Father were following the proper procedures for feeding her. N.T., 9/30/16, at 33. Instead, the trial court found that A.M.P. lost six ounces during the 49 days between her discharge from The Children's

Institute and the dependency hearing. In other words, A.M.P. weighed at least 55 ounces less than she would have if Mother and Father were providing her with proper parental care for her physical health.[1] Although this may seem like a small difference, 55 ounces represents over one-quarter of A.M.P.'s weight. The testimony at the dependency hearing was that this weight loss, instead of a weight gain, may cause A.M.P. to "develop another life-threatening condition." N.T., 9/30/16, at 33.

The record reflects that Mother misinformed Dr. Catherine Udekwu about A.M.P.'s weight. Dr. Udekwu testified that A.M.P.'s weight was below the third percentile and this was concerning. *Id.* at 107. Dr. Udekwu, however, was under the impression that this was a weight gain for A.M.P. *Id.* As noted above, this was incorrect. This was a six ounce weight loss from when A.M.P. was discharged from The Children's Institute.[2] During the

---

[1] In light of the uncontroverted evidence that A.M.P. lost weight after discharge from The Children's Institute, I fail to understand how the learned Majority makes the legal conclusion that, "Since A.M.P.'s discharge from the hospital, parents continue to provide proper care." *Majority Memorandum*, *ante* at 5. In fact, I am very troubled by the fact that A.M.P. was gaining weight when in the hospital by being fed a special formula through a nasogastric ("NG") feeding tube; however, upon discharge (with instructions to continue the NG tube feedings), Mother, along with an occupational therapist, chose to stop the NG tube feedings and switch to a bottle. N.T., 9/30/16, at 148.

[2] It is not clear from the record why Mother provided Dr. Udekwu with incorrect information as to A.M.P.'s weight loss. I note, however, that Mother refused to sign releases so that Dr. Dannika Wallace and another doctor, two of A.M.P.'s previous pediatricians, could release A.M.P.'s medical records to the doctors that subsequently cared for A.M.P. N.T., 9/30/16, at

*(Footnote Continued Next Page)*

dependency hearing, when told that A.M.P. had actually lost weight since her discharge from The Children's Institute, Dr. Udekwu indicated that that concerned her. *Id.* at 116.

Mother is correct that the underlying cause of A.M.P.'s medical condition is not definitively known (although, as the trial court found, the doctors at Children's Hospital believe that a milk allergy is the cause). What is known, however, is that proper medical care is capable of treating A.M.P.'s failure to thrive, while doctors attempt to find the cause of her condition.[3] Mother and Father have refused to provide the appropriate parental care to

*(Footnote Continued)* ────────────

81-82. I find this fact to be very troubling as it raises the concern that Mother was attempting to hide A.M.P.'s medical history from her treating physicians.

Moreover, Mother testified at the dependency hearing that the stay at Children's Hospital and The Children's Institute, the only 29 days of A.M.P.'s life where she gained an appropriate amount of weight, was a "waste of [her] time." *Id.* at 147. Mother also incorrectly testified at the dependency hearing that A.M.P. had gained weight since her discharge from The Children's Institute. *Id.* at 166. A.M.P. not only failed to gain weight since her discharge, she actually lost weight since her discharge.

[3] As the trial court found, the evidence also establishes that proper medical care, *i.e.*, the use of a topical steroid, improves A.M.P.'s eczema. Once again, however, I am troubled that, upon discharge from the hospital, A.M.P.'s eczema worsened. As Dr. Udekwu testified, when she saw A.M.P. on September 29, 2016, "[h]er skin was worse. It was more weepy. [A.M.P.] was more itchy. She seemed uncomfortable. She looked worse than she did the week before." N.T., 9/30/16, at 109-110. Thus, while under the care of the hospital, A.M.P. was improving; however, upon discharge and under the care of Mother and Father, A.M.P.'s condition worsened.

- 4 -

treat A.M.P.'s symptoms, which could lead to A.M.P. facing a life-threatening medical condition.

Turning to A.M.P.'s immunizations, the trial court found that A.M.P. was not immunized. Furthermore, the trial court found that this lack of immunizations was more concerning for an individual with A.M.P.'s medical conditions. The uncontradicted testimony at the dependency hearing was that Mother continually chose not to immunize A.M.P. despite the doctors' recommendations. The record further reflects that Mother and Father are not religiously or otherwise generally opposed to immunizations. *Cf.* Trial Court Order, 9/30/16, at 1 (finding that A.M.P.'s sister is up-to-date on all of her immunizations). Dr. Udekwu testified that Mother's fears about vaccinations for A.M.P., *i.e.*, A.M.P.'s weight and potential allergies, were unfounded. *See* N.T., 9/30/16, at 111-112.

Mother argues that she was merely asking questions and taking time to make a decision regarding A.M.P.'s immunizations. Although I agree with Mother that asking questions is proper parental care, refusing to listen to every doctor's recommendation regarding immunizations because of an incorrect belief regarding A.M.P.'s medical condition is not proper parental care.[4] Thus, the trial court's factual findings indicate that Mother and Father are not providing proper parental care for A.M.P.'s physical health.

---

[4] The learned Majority incorrectly focuses upon whether there is law which generally requires children A.M.P.'s age to be immunized. *See Majority*
*(Footnote Continued Next Page)*

CYF's petition did not seek to remove A.M.P. from Mother and Father's care. Instead, CYF only sought a declaration that A.M.P. was dependent so that it could provide support to Mother and Father necessary to ensure that A.M.P. receives the proper medical care. Based upon the trial court's own factual findings, I believe that it erred in concluding that A.M.P. had proper parental care necessary for her physical health. Accordingly, I would reverse the trial court's order dismissing CYF's petition and remand for entry of an order declaring A.M.P. dependent.

---

*(Footnote Continued)*

**Memorandum**, **ante** at 6, *citing* 28 Pa. Code § 23. The focus in this dependency proceeding is on whether immunizations are required in order to care for A.M.P.'s physical health. It is clear that they are.